# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WILLIAM R. SHORE,<br><br>                 Plaintiff,<br>vs.<br><br>UNITED STATE OF AMERICA,<br>(Internal Revenue Service)<br><br>                 Defendant. | Case No. 1:13-CV-220-EJL-REB<br><br><br>**MEMORANDUM DEICISION AND ORDER** |

      Plaintiff filed this action after paying the amount allegedly due under a trust fund recovery penalty for unpaid payroll withholding taxes for Bear River Equipment, Inc. ("BRE"), assessed against him pursuant to 26 U.S.C. § 6672. Plaintiff seeks a refund of employee payroll taxes and penalties he was required to submit for seven tax periods in 2006 and 2007. This matter is before the Court on the Motion for Summary Judgment filed by Defendant United States of America. (Dkt. 20.)

      The parties have submitted their briefing on the motion and the matter is now ripe for the Court's review. Having fully reviewed the record herein, the Court finds that the facts and legal arguments are adequately presented in the briefs and record. Accordingly, in the interest of avoiding further delay, and because the Court conclusively finds that the

decisional process would not be significantly aided by oral argument, the motions shall be decided on the record before this Court without oral argument. For the following reasons, the Court will grant Defendant's motion for summary judgment.

## I. Facts

Plaintiff William Shore ("Shore") owned real property (the "property") he leased to Countryside Repair & Equipment ("Countryside"), a farm equipment seller, until late 2004, when Countryside closed. At the time Countryside ended its lease with Shore, a representative for McCormick Tractors, a line of tractors sold by Countryside, proposed that Shore start his own business on the property and become a McCormick dealer. Shore was initially uninterested in starting a business because he was retired and lived far away from the property. The McCormick dealer then suggested the manager of Countryside, Tom Lewis ("Lewis"), had 25 years of experience buying and selling tractors, and could run the business for Shore.

Shore met with Lewis and ultimately decided to form BRE. Shore and Lewis verbally agreed that Lewis would run the business and would have the option to purchase the business at any time by repaying Shore's initial $150,000 investment in the company with interest. Although they did not sign any agreements or formally memorialize any terms, both Shore and Lewis believed that Lewis would eventually purchase BRE.

Pursuant to their verbal agreement, Shore hired Lewis to manage every aspect of the business, including day to day operations, financial management, purchasing of product lines, paying all of BRE's bills, and other duties required to run an equipment

sales business.[1] Lewis was responsible for supervising, hiring and firing employees, as well as for submitting all tax forms for BRE and paying its payroll taxes. Shore viewed his role in BRE as an investor, and essentially treated the company as if it belonged to Lewis. Lewis and his wife, Maureen Lewis, also treated BRE as their own company, and held themselves out to others, such as an accountant they hired to work for BRE, as the owners of the company. However, Lewis never exercised the option to purchase BRE.

While Shore played a very limited role in the operation of BRE, he signed the Articles of Incorporation as President of BRE, owned all of the shares in BRE,[2] signed various contracts on behalf of BRE as its president,[3] and personally guaranteed an operating line of credit eventually obtained by BRE from Ireland Bank.[4] Shore had telephone calls with Lewis once or twice a month to discuss operations at BRE,[5] and made quarterly visits to BRE to check inventory and generally assess the business.[6]

---

[1] BRE did not have any by-laws or minutes from meetings documenting who the elected officers of the corporation were or what respective authority Shore or Lewis had.

[2] When BRE was formed in 2005, Shore and his then wife, Roberta Shore each owned 50% of the company. After Shore and Roberta divorced in 2006, Shore owned all of the shares in BRE. (Dkt. 20-1, ¶ 2.)

[3] Such agreements included an Inventory Security Agreement with Agricredit Acceptance LLC, an Inventory Financing Agreement with GE Commercial Distribution Finance Corporation, a Dealership Agreement and Security Agreement with MacDon Industries Ltd., and a Retail Distributor Agreement and Security with McCormick International U.S.A. Inc. (Dkt. 20-1, ¶¶ 11-14.) Shore personally guaranteed BRE's obligations to each of the aforementioned entities. (*Id*.)

[4] (*Id*., ¶15.)

[5] (Dkt. 22-2, "Shore Deposition," pp. 53-56.)

[6] (*Id*., pp. 65-66.)

Shore also reviewed balance sheets and annual statements Lewis sent him for BRE.[7] Prior to incurring the payroll tax liability at issue in this suit, Shore noticed and directed Lewis to satisfy unpaid payroll obligations from 2005.[8] Shore ensured Lewis paid the payroll obligations from 2005 by the January 2006 deadline.[9] Finally, Shore had authority to sign checks on the Ireland Bank account, though he did not write any checks on the account, and was listed on the Ireland Bank check signature card as "owner" of BRE.

In August 2007, Shore received notice from an Internal Revenue Service Agent that there were some serious issues with BRE's employment taxes for 2006 and 2007. This notice was the first time Shore became aware that BRE's 2006 and 2007 payroll taxes had not been paid. Shore subsequently learned that Lewis had been embezzling from BRE, failing to pay creditors or pay BRE's taxes, and stealing BRE's assets. Upon discovering Lewis' fraud, Shore fired Lewis and took over management of BRE.[10] Shore

---

[7] (*Id.*, pp. 42, 61, 68-70.) Shore later learned such financial statements were false. (*Id.*)

[8] (*Id.*, pp. 63-65, 76, 77-79.)

[9] (*Id.*)

[10] In his summary judgment papers, Shore claims that he did not fire Lewis and that Lewis instead quit, and suggests that whether he had the authority to hire and fire employees is thus a genuine issue of fact precluding summary judgment. (Dkt. 22, pp. 11, 19.) However, Shore alleged in his complaint that he removed Lewis (Dkt. 1, ¶53), and also confirmed that he fired Lewis in his deposition. (Shore Deposition, pp. 90, 133-134.) Statements in a party's pleadings are conclusively binding on that party. *American Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988). Moreover, a party cannot create a genuine issue of material fact by contradicting their own prior testimony. *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991).

ultimately decided to close BRE because he believed he could not pay all of the liabilities and contribute sufficient working capital to keep the company going.[11] Before closing the company, however, Shore allowed more than $120,000 from BRE's checking accounts to be paid to unsecured creditors other than the United States. Although Shore believed he should not be held liable for BRE's unpaid payroll taxes because he was not a responsible party and did not willfully ignore tax obligations, Shore ultimately paid $101,583.09 in trust fund recovery penalties to the United States, and later filed the instant suit to obtain a refund.

## II. Discussion

### A. Standard of Review

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). One of the principal purposes of the summary judgment rule "is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). It is not "a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327.

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is

---

[11] (Shore Deposition, pp. 17, 154.)

that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). Material facts are those "that might affect the outcome of the suit." *Id*. at 248. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987).

The moving party is entitled to summary judgment if that party shows that each material fact cannot be disputed. To show that the material facts are not in dispute, a party may cite to particular parts of materials in the record, or show that the adverse party is unable to produce admissible evidence to support the fact. Fed.R.Civ.P. 56(c)(1)(A) & (B). If the moving party meets its initial responsibility, then the burden shifts to the opposing party to establish that a genuine dispute as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). When making the summary judgment determination, the court must view the evidence, and all justifiable inferences from the evidence, in the light most favorable to the non-moving party. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630–31.

B. Liability under 26 U.S.C. § 6672

The Internal Revenue Code requires employers to withhold federal income and social security taxes from the wages of their employees. *See* 26 U.S.C. §§ 3102(a), 3402(a). The employer holds the withheld taxes "in trust" for the United States and must pay them over to the government on a quarterly basis. 26 U.S.C. § 7501(a). The withheld amounts are known as trust fund taxes. *Davis v. United States*, 961 F.2d 867,

869 (9th Cir. 1992). If an employer withholds the taxes from its employees but fails to remit them, the government must nevertheless credit the employees for having paid the taxes, and seek the unpaid funds from the employer. *Id*. Under 26 U.S.C. § 6672(a), the IRS may assess a 100% penalty on responsible persons who willfully fail to collect, account for, and pay over the taxes to the United States.[12] *United States v. Jones*, 33 F.3d 1137, 1138 (9th Cir. 1994).

In order for the United States to assess the 100% penalty under § 6672, two requirements must be met: (1) the party assessed must be a "responsible person," i.e., one required to "collect, truthfully account for and pay over the tax," and (2) the party assessed must have "willfully refused to pay the tax."[13] *Id.* at 1139. The individual against whom an assessment is made "bears the burden of proving by a preponderance of the evidence that one or both [of the elements of responsibility and willfulness] is not present." *Id.* (quoting *Hochstein v. United States*, 900 F.2d 543, 547 (2d Cir. 1990)). Shore argues that neither the responsibility nor the willfulness elements of the § 6672 test are present in this case.

---

[12] § 6672(a) provides, in part, that:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

[13] Although labeled a "penalty," § 6672 is not generally a punitive provision as it "brings to the government only the same amount to which it was entitled by way of the tax." *Turnbull v. United States*, 929 F.2d 173, 178, n. 6 (5th Cir. 1991) (internal citation and quotation omitted).

**MEMORANDUM DECISION AND ORDER– Page 7**
14ORDERS:SHORE_SJ

*1. Responsible Person Prong*

It is undisputed that Shore delegated full authority for handling BRE's finances and management to Lewis, and that for so long as Lewis remained at the company Shore did not take an active role in financial matters. Shore maintains that he was therefore not a "responsible person" during Lewis' tenure as manager of BRE and thus cannot be liable under § 6672 for the employment taxes that went unpaid during that period.

For purposes of § 6672, responsibility "is a matter of status, duty, and authority[.]" *Davis*, 961 F.2d at 873 (citations omitted). "Authority turns on the scope and nature of an individual's power to determine how the corporation conducts its financial affairs; the duty to ensure that withheld employment taxes are paid overflows from the authority that enables one to do so." *Purcell v. United States*, 1 F.3d 932, 937 (9th Cir. 1993) (citations omitted). That an "individual's day-to-day function in a given enterprise is unconnected to financial decision making or tax matters is irrelevant where the individual has the authority to pay or to order the payment of delinquent taxes." *Id*. (citations omitted). Similarly, delegation of authority to pay taxes will not relieve a person of responsibility. *Id*. at 936-937 (courts have uniformly and repeatedly rejected the theory that delegation of authority to pay taxes will relieve an individual from responsible person status).

In order to determine whether someone has the authority to pay taxes, and is thus "responsible" under § 6672, courts have looked to a number of non-exclusive factors common in the § 6672 case law, such as whether the taxpayer served as an officer of the corporation or a member of its board of directors, owned a substantial amount of stock in the company, participated in day-to-day management of the company, determined which

**MEMORANDUM DECISION AND ORDER– Page 8**

14ORDERS:SHORE_SJ

creditors to pay and when to pay them, had the ability to hire and fire employees, or possessed check writing authority. *See, e.g., Conway v. United States*, 647 F.3d 228, 233 (5th Cir. 2011); *Johnson v. United States*, 734 F.3d 352, 361 (4th Cir. 2013); *United States v. Jones*, 33 F.3d 1137, 1140 (9th Cir. 1994). Not every factor must be present, instead, the Court must consider the totality of the circumstances to determine whether Shore had the "effective power" to pay the taxes owed by BRE. *Erwin v. United States*, 591 F.3d 313, 321 (4th Cir. 2010). Significantly, as more than one person may meet these criteria, "[t]here may be—indeed—there usually are—multiple responsible persons in any company." *Barnett v. Internal Revenue Service*, 988 F.2d 1449, 1455 (5th Cir. 1995). The statute "expressly applies to 'any' responsible persons, not just to the person *most* responsible for the payment of taxes." (*Id*.) (emphasis in original) (citation omitted). As such, "[t]hat another person in the company has been delegated the jobs of withholding and generally paying creditors is beside the point." *Id*. The "crucial inquiry" is whether a party, such as Shore, "by virtue of his position in (or vis-à-vis) the company," could have had "substantial" input into such financial decisions, had he wished to exert his authority. *Id*.

In this case, the undisputed evidence establishes that Shore was a responsible person under § 6672. First, Shore was BRE's president. Although a party "cannot be presumed to be a responsible person merely from titular authority, status as an officer or director is nevertheless material to this determination." *Johnson,* 734 F.3d at 361 (4th Cir. 2013) (internal citations and quotations omitted). Shore suggests he was "[p]resident in name only." (Dkt. 22, p. 9.) Shore also notes BRE did not have corporate by-laws

delineating his specific corporate authority, and that he did not exercise any of the traditional duties of a corporate president. (*Id*.) However, it is undisputed that Shore signed contracts on BRE's behalf as its president, including inventory agreements BRE needed in order to obtain the farm equipment it sold, and that Shore also personally guaranteed such contracts. Shore also signed on BRE's behalf and as its president when BRE opened a line of credit at Ireland Bank, and personally guaranteed the Ireland Bank line of credit. Further, Shore was BRE's sole shareholder. He thus "had the effective power to change" the company's employees "and thereby direct the business of the corporation." *Johnson*, 734 F.3d at 361. Shore also possessed, but did not utilize, check writing authority on BRE's account with Ireland Bank.

Shore did not manage the day-to-day operations of the company or, at least while Lewis served as manager of BRE, determine which creditors to pay and when to pay them. However, Shore had monthly telephone calls with Lewis to discuss the business, made unannounced visits to BRE to assess inventory, and reviewed BRE's financial statements. It is unmistakable from Shore's deposition testimony that he believed, by virtue of his position in BRE, that he had a right to know the financial condition of the company.

In his deposition, Shore also significantly testified that when he learned Lewis had not satisfied payroll liabilities in 2005, he called Lewis and ensured such liabilities were paid. (Shore Deposition, pp. 63-65, 76, 77-79.) Shore thus had the authority to order the payment of delinquent taxes. *See Denbo v. United States*, 988 F.2d 1029, 1033 (10th Cir. 1993) (although "it was Allred…who controlled the day-to-day operations of the

corporation and made decisions concerning the payment of creditors and disbursement of funds," Denbo remained responsible where he had "significant, as opposed to absolute, control of the corporations finances."); *McDermitt v. United States*, 954 F.2d 1245, 1251 (6th Cir.1992) ("[a]lthough not an officer of the corporation," plaintiff was responsible because "[h]e had the power and the authority to direct the payment and non-payment of the corporation's liabilities.").

As mentioned, although Shore delegated financial management of BRE to Lewis, as well as the authority to determine which creditors to pay and when to pay them, the cases are clear that delegation of such authority does not relieve a party of responsibility under § 6672. *Johnson*, 734 F.3d at 362. A taxpayer may be a "responsible person" if he "had the authority required to exercise significant control over the corporation's financial affairs, regardless of whether he exercised such control in fact." *Purcell*, 1 F.3d at 937 (concluding that a president and sole shareholder, who was also the authorized signatory on the corporation's checking account, was a "responsible person" even though he had fully delegated all financial duties to another employee). Thus, despite delegating his authority to Lewis and permitting him to run BRE's daily affairs, Shore remained a "responsible person" because he had effective control of the corporation and the effective power to direct the corporation's business choices, including the withholding and payment of trust fund taxes.

Shore was also ultimately responsible for hiring and firing Lewis. When asked, in his deposition, "Is it fair to say you hired Mr. Lewis," Shore responded "Oh, yes, I did. I

hired Mr. Lewis." (Shore Deposition, p. 45.) Shore also confirmed he fired Lewis more than once during his deposition:

> Q: You hired and eventually fired Mr. Lewis; correct?
>
> A: Yes.

(*Id.*, p. 90).

> Q: You eventually decided to fire the Lewises; right?
>
> A: Yes.

(*Id.*, p. 133).

> Q: What explanation did you give the Lewises when you fired them?
>
> A: I'm not sure I gave them—I don't remember what I said to them. It wasn't real pleasant, but it was firm, you know.
>
> Q: Did you do it in person?
>
> A: Yes. Yeah.
>
> Q: How come you had the authority to fire the Lewises?
>
> A: Well, I don't know. Somebody had to do it, I guess. I mean it wasn't my company specifically, but I was paying all the bills. I mean I was the one that was on the hook.

(*Id.*, p. 134.)

Although Lewis was responsible for hiring and firing employees at BRE, Shore, in his capacity as president, obviously possessed enough authority over corporate affairs to independently investigate Lewis and ultimately force him and Maureen Lewis out of the company. Within two months of learning of BRE's tax deficiencies, Shore took

**MEMORANDUM DECISION AND ORDER– Page 12**

14ORDERS:SHORE_SJ

complete control of BRE's financial operations, which also establishes his authority to do so. Shore also continued to run BRE, and kept certain BRE employees working, for a short time after he fired the Lewises:

> Q: I'd like to talk now about after you fired the Lewises, which I think we've fixed now to about October 1 or 2, 2007.
>
> A: Yes, uh-huh.
>
> Q: Did you keep other employees on after that point?
>
> A: Yes. We were attempting to—repair certain equipment. We had certain mechanics that were working. We had a baler mechanic that was working. We did some payroll after that time.

(*Id.*, p. 153-54.)

The undisputed facts thus conclusively establish that Shore possessed the status, duty, and authority necessary to be a responsible person under § 6672, as evidenced by his title, stock ownership, check writing authority, because Shore ensured the 2005 payroll taxes were paid upon learning they had not been remitted, by Shore's ability to force the Lewises out of the business, and, perhaps most importantly, because Shore ultimately took complete control over BRE once he learned of the tax liability. Therefore, the Court finds Shore was a responsible person as a matter of law. *See Barnett*, 988 F.2d at 1454 (noting "countless courts have found responsibility [for purposes of § 6672] as a matter of law" because "certain facts will almost invariably prove dispositive of a finding of responsibility."); *Erwin*, 591 F.3d at 321(affirming finding plaintiff was responsible person as a matter of law where plaintiff owned one-

third interest in company and served as a corporate officer and director, selected business sites, hired and fired employees, and, within months of learning of the company's tax deficiencies, took complete control of the company's financial operations); *Jefferson v. United States*, 546 F.3d 477, 481 (7th Cir. 2008) (board president was a responsible person as a matter of law because he secured loans and directed past payment of taxes for the corporation, reviewed financial reports, and had check-signing authority); *Kinnie v. United States*, 994 F.2d 279, 284 (6th Cir. 2993) (corporate vice president and fifty-percent shareholder was a responsible person as a matter of law because he had check-signing authority, hired an accountant to review the books, and eventually took control of the business).

2. *Willfulness Prong*

Having found Shore a "responsible person," the Court must turn to the other necessary element of § 6672 liability, whether Shore "willfully" failed to collect, account for, or remit payroll taxes to the United States. § 6672(a). A long line of decisions in the Ninth Circuit have defined willfulness "as a voluntary, conscious and intentional act to prefer other creditors over the United States." *Davis*, 961 F.2d at 871 (citations omitted). In order to satisfy the willfulness prong, "[n]o bad motive need be proved, and conduct motivated by reasonable cause, such as meeting the payroll, may be 'wilful.'" *Buffalow v. United States*, 109 F.3d 570, 573 (9th Cir. 1997) (citing *Phillips v. United States IRS*, 73 F.3d 939, 942 (9th Cir.1996); *Jones v. United States*, 60 F.3d 584, 587–88 (9th Cir.1995); *Klotz v. United States*, 602 F.2d 920, 923 (9th Cir.1979); *Teel v. United States*,

529 F.2d 903, 905 (9th Cir.1976)). Although undoubtedly "harsh," this standard is the law. *Id*. As the Ninth Circuit has explained:

> If a responsible person knows that withholding taxes are delinquent, and uses corporate funds to pay other expenses, even to meet the payroll out of personal funds he lends the corporation, our precedents require that the failure to pay withholding taxes be deemed 'willful.' This may seem oppressive to the employer and employees, and amount to 'unwittingly' willful, which seems an oxymoron, but the proposition is established law.

*Phillips*, 73 F.3d at 942 (citations omitted).

Shore suggests his conduct was not willful because he did not know about BRE's tax liability at the time BRE failed to remit payroll taxes in 2006 and 2007. (Dkt. 22, p. 16.) However, a taxpayer may act "willfully" for purposes of § 6672 even though he does not learn about unpaid taxes until after the corporation has failed to pay them. *Johnson*, 734 F.3d at 364. When "a responsible person learns that withholding taxes have gone unpaid in past quarters for which he was responsible, he has a duty to use all current and future unencumbered funds available to the corporation to pay those back taxes." *Erwin*, 591 F.3d at 326. If the taxpayer instead knowingly permits payments of corporate funds to be made to other creditors, a finding of willfulness is appropriate. *Id.* ("Even assuming ... that [the taxpayer] did not act willfully prior to learning of the full extent of the tax deficiencies ..., his conduct *after* that point unquestionably evidences willfulness as a matter of law.") (emphasis in original).

Here it is undisputed that Shore learned of BRE's unpaid tax liability in August 2007. It is also undisputed that BRE paid more than $120,000 to unsecured creditors

after Shore learned of BRE's tax liability.[14]  Shores' failure to remedy the payroll tax deficiencies upon learning of their existence in August 2007, while subsequently allowing corporate payments to be made elsewhere, including to unsecured creditors, constitutes "willful" conduct under § 6672.  *See Phillips*, 73 F.3d at 942-43 (where a responsible person is aware that trust fund taxes are unpaid but permits the business to continue its operation and pay other creditors, the willfulness prong is satisfied.).

       3.  *The Slodov Exception*

Shore also contends his actions fall within a narrow exception to § 6672 liability carved out by the Supreme Court in *Slodov v. United States*, 436 U.S. 238 (1978).  In *Slodov*, the Supreme Court held new management of a corporation is not personally liable for a § 6672 penalty upon using after-acquired revenue to satisfy creditors other than the United States, provided the new management assumes control when a delinquency for trust fund taxes already exists and the withheld taxes have already been dissipated by prior management.  *Davis*, 961 F.2d at 871-72 (citing *Slodov*, 436 U.S. at 259-60.)  The Supreme Court in *Slodov* based this holding in part:

> [O]n the rationale that to hold a taxpayer personally liable to the extent of after-acquired funds for taxes owed during a time in which he was not a responsible person would be to discourage new investors from attempting to salvage a failing business, which, if the salvage effort were successful, would enable the government to collect more in delinquent taxes than if the business failed.

---

[14] In its Statement of Material Facts in Support of Summary Judgment, the United States claimed, "[O]n or after August 14, 2007, BRE paid more than $120,000 out of its checking accounts to unsecured creditors other than the United States." (Dkt. 20-1, ¶ 28) (citing evidence in support).  Shore did not address this statement in his summary judgment papers.  A court may consider a fact undisputed for purposes of summary judgment if a party fails to address another party's assertion of fact as required by Rule 56(c). Fed. Rule Civ. Proc. 56(e).

**MEMORANDUM DECISION AND ORDER– Page 16**
14ORDERS:SHORE_SJ

*Kinnie*, 994 F.2d at 285 (citing *Slodov*, 436 U.S. at 252-253).

Shore suggests he falls within the *Slodov* exception because he did not have responsibility for management of BRE at the time the tax delinquency was incurred and because BRE's debts exceeded its available assets when Shore took over management of the company. Shore thus contends his conduct was not willful under the *Slodov* exception, even though he admittedly used after- acquired money to pay debts, wages and expenses to keep BRE running rather than paying the back taxes owed to the IRS. (Dkt. 22, pp. 17-18.) The problem with Shore's theory is that the Court has determined Shore *was* a responsible person at the time the 2006 and 2007 tax liability accrued. Unlike in *Slodov*, Shore was not a new purchaser of BRE, but was instead a responsible person when BRE's tax liability for 2006 and 2007 went unpaid. As such, holding Shore personally liable for an amount based on after-acquired funds would not discourage new investors from attempting to save BRE's failing business. *Kinnie*, 994 F.2d at 285. Shore already was an investor in BRE and, as discussed above, had the authority to handle BRE's finances, though he delegated this authority to Lewis, at the time the tax liability was incurred. As such, "a degree of personal fault can be attributed to [Shore] in that he failed to fulfill his responsibilities during the time that the tax delinquency accrued." *Id*.

In *Purcell*, 1 F.3d at 938, the Ninth Circuit expressly declined to extend the *Slodov* exception to a case where, as here, a company president delegated authority to run a corporation to a manager but resumed control of the corporation upon learning of the manager's embezzlement. In so holding, the *Purcell* Court emphasized that *Slodov* does

**MEMORANDUM DECISION AND ORDER– Page 17**

14ORDERS:SHORE_SJ

not apply in cases where existing, but inactive, management takes control of a business after learning of unpaid tax liability. *Id*.

Similarly, in *Davis*, 961 F.2d at 873-74, a company president argued the *Slodov* exception should apply because he was unaware the company's taxes had not been paid until after they were due, and that once he learned that the company was not paying employees' withholding taxes, he assumed a more active role in supervising corporate disbursements. *Id*. at 873. The Ninth Circuit held transfers in responsibility internal to the corporation cannot be equated with the accession of new management that occurred in *Slodov*.[15] *Id*. at 873-74. Where, as here, an individual is a responsible person both before and after tax liability accrues, there is a duty to use unencumbered funds acquired after the withholding obligation becomes payable to satisfy that obligation.[16] "[F]ailure

---

[15] The *Davis* Court further explained Davis' interpretation of *Slodov* would "encourage corporate roulette," as:

> Responsible officers, upon learning that taxes had gone unpaid during their watch, could simply rotate their respective responsibilities and duties. Once the officers assumed their new duties, they would be relieved from section 6672 personal liability for the use of forthcoming revenues to pay debts other than the back taxes. The corporation could thus delay compensating the federal treasury for the use of its money indefinitely, thereby freeing up corporate income for more self-interested expenses.

*Id*. at 874.

[16] Although a taxpayer does not act willfully by paying funds to a secured creditor over the government because such funds are encumbered and thus unavailable to satisfy tax liability, *Nakano v. United States*, 742 F.3d 1208, 1211-12 (9th Cir. 2014), Shore does not dispute that BRE paid more than $120,000 to unsecured creditors shortly after he learned about BRE's tax liability. The *Nakano* exception accordingly does not apply, regardless of BRE's responsibility to secured creditors. *See also Honey v. United States*, 963 F.2d 1083, 1090 (8th Cir. 1992) (person against whom § 6672 liability is assessed

to do so when there is knowledge of the liability constitutes willfulness." *Id*. at 876 (quoting *Mazo v. United States*, 591 F.2d 1151, 1157 (5th Cir. 1979)). Once he became aware of BRE's tax liability in August 2007, Shore had a duty to ensure that the taxes were paid before any payments were made to other creditors. *Mazo*, 591 F.2d at 1157 (5th Cir. 1979). The undisputed evidence that he failed to do so establishes willfulness as a matter of law. *Id*.; *see also Barnett*, 988 F.2d at 1457 (willfulness is normally proved with evidence that the responsible person paid other creditors with knowledge that withholding taxes were due at the time to the United States).

The Court sympathizes with Shore's predicament and regrets the unfortunate circumstances preceding this case. However, allowing a responsible party to divert after-acquired funds to pay liabilities other than that owed for unpaid payroll taxes would in effect require the federal government to subsidize the corporation's recovery by foregoing collectible tax dollars. *Davis*, 961 F.2d at 878. As numerous courts have counseled, "[T]he government cannot be made an unwilling partner in a business experiencing financial difficulties." *Id*. (quoting *Thibodeau v. United States*, 828 F.2d 1499, 1506 (11th Cir. 1987); *see also Mazo*, 591 F.2d at 1154 ("[T]he United States may not be made an unwilling joint venture in the corporate enterprise.").

---

has burden of proving that all potentially available funds were encumbered.); *Conway v. United States*, 647 F.3d 228, 237 (5th Cir. 2011) (Taxpayer failed to meet his burden of raising fact issue on encumbrance where he submitted no evidence that funds paid to other creditors had a legal priority over the unpaid excise taxes); *Barnett*, 988 F.2d at 1458 ("We next observe that the burden to prove that the loan proceeds and accounts receivable deposited into the Company's bank accounts…were 'encumbered' falls on the [the taxpayer.]").

**MEMORANDUM DECISION AND ORDER– Page 19**
14ORDERS:SHORE_SJ

# ORDER

Having carefully considered the filings of all the parties and entire record in this case, and for the reasons stated herein;

IT IS HEREBY ORDERED that Defendant United States' Motion for Summary Judgment (Dkt. 20) is **GRANTED**.

DATED: December 4, 2014

Edward J. Lodge
United States District Judge